IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                                                                                    No. CR 21-1338 JB

MARTY PADILLA,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

      **THIS MATTER** comes before the Court on the Defendant's Objections to Presentence Investigation Report, filed December 14, 2022 (Doc. 51)("Padilla Objection"). The primary issue presented is whether Defendant Marty Padilla's base offense levels for the three counts to which he has pled guilty are each subject to 5-level increases under § 2B3.1(b)(2)(C) of the United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") for brandishing a firearm. The Court concludes that a preponderance of the evidence does not support a finding that Padilla brandished a firearm in the course of the three robberies and, therefore, that a 5-level increase does not apply to the base offense levels for the robberies under U.S.S.G. § 2B3.1(b)(2)(C). Accordingly, the Court sustains Padilla's objection, and concludes that with a total offense level of 23 and a criminal history category of I, the Guidelines establish an imprisonment range of 46 to 57 months.

**FACTUAL BACKGROUND**

      When the United States of America asserts that a defendant's sentence is base offense level is subject to an increase under the Guidelines, the United States must prove that the enhancement applies by a preponderance of the evidence. See United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.). If a defendant objects to an enhancement's

applicability, the Court can accept any of the presentence report's uncontested factual allegations as true. See Fed. R. Crim. P. 32(i)(3)(A). The Court must "rule on the dispute[d factual allegations] or determine that a ruling is unnecessary . . . ." Fed. R. Crim. P. 32(i)(3)(B). Here, the Court bases its findings of fact on the Presentence Investigation Report, filed November 4, 2022 (Doc. 46)("PSR"), Plea Agreement, filed August 2, 2022 (Doc. 42), Criminal Complaint, filed August 5, 2021 (Doc. 1)("Complaint"), and the underlying Police Reports, filed January 17, 2023 (Doc. 55).

Between July 11, 2021, and July 27, 2021. A heavy-set man with tattooed arms robbed at least a dozen businesses in Albuquerque, New Mexico. Police Reports at 1. Padilla was charged in connections with the robberies. See Complaint ¶ 3, at 2. He pled guilty to three counts of violating pled guilty to three counts of violating 18 U.S.C. § 1951, one count for three of the robberies. See Plea Agreement ¶ 7, at 3-5. The Court summarizes the facts of the three robberies to which Padilla pled guilty.

### 1. July 11, 2021, Store Robbery.

On July 11, 2021, officers were dispatched to a store in Albuquerque's southwest quadrant. See PSR ¶ 11, at 5. The cashier indicated that a "heavy-set" male wearing a black t-shirt, gray hat with black brim, and black surgical mask robbed the store. PSR ¶ 11, at 5. The cashier reported that the man entered the store, walked up to the register, and demanded all the money from the register. See PSR ¶ 11, at 5. The man also "lifted his shirt and exposed" what appeared to be "a black handgun."[1] PSR ¶ 11, at 5. The cashier handed the man approximately $500.00. See PSR

---

[1] The PSR, Plea Agreement, and underlying police reports offer conflicting accounts of whether the store cashier said that Padilla had a firearm or whether Padilla had an object that resembled a firearm. In the Plea Agreement, Padilla admits that he robbed the store with "what appeared to be a black handgun." Plea Agreement ¶ 7, at 4. Meanwhile, the PSR asserts that Padilla committed the store robbery with a black handgun. See PSR ¶ 11, at 5. One of the

¶ 11, at 5. The man ran out of the store and fled the area in a black Dodge Avenger without a license plate. See PSR ¶ 11, at 5.

        2.        **July 23, 2021, Pharmacy Robbery.**

Twelve days later, on July 23, 2021, officers were dispatched to a pharmacy in Albuquerque's southwest quadrant. See PSR ¶ 12, at 5. The cashier stated that a "heavy-set male" robbed the pharmacy. PSR ¶ 12, at 5. According to the cashier, the man entered the pharmacy and pretended to purchase an energy drink. See PSR ¶ 12, at 5-6. At the register, the man told the cashier, "give me everything in the f*cking register, I don't wanna shoot you today." PSR ¶ 12, at 6 (asterisk in original). The man also "grabb[ed] the handle" of what appeared to be "a grey firearm."[2] PSR ¶ 12, at 6. The cashier stepped back, told the man, "you do it," and the man proceeded to lean over the counter and take cash from the register. PSR ¶ 12, at 6. The man then fled the scene in a black four-door sedan. See PSR ¶ 12, at 6.

The officers reviewed the pharmacy's security footage. See PSR ¶ 12, at 6. They observed that the man the cashier described was wearing a blue shirt, black shorts, and gray hat with a black

---

underlying police reports explains that "witnesses described that they observed what appeared to be a handgun in [Padilla's] waistband when he would commit these crimes." Police Reports at 5. By contrast, another police report states that the store cashier reported that Padilla "expos[ed] a black handgun." Police Reports at 16. The Court resolves these contradictions here by finding that the store cashier saw what appeared to be a firearm.

[2]The PSR, Plea Agreement, and underlying police reports offer conflicting accounts of whether the pharmacy cashier said that Padilla had a firearm or whether Padilla had a weapon that appeared to be a firearm. In the Plea Agreement, Padilla admits that he robbed the pharmacy with "what appeared to be a grey handgun." Plea Agreement ¶ 7, at 4. Meanwhile, the PSR asserts that Padilla committed the pharmacy robbery with a grey firearm. See PSR ¶ 12, at 5-6. One of the underlying police reports explains that "witnesses described that they observed what appeared to be a handgun in [Padilla's] waistband when he would commit these crimes." Police Reports at 5. Another police report indicates that the pharmacy cashier told the responding officer that Padilla "brandished a grey in color firearm." Police Reports at 17. The Court resolves these contradictions here by finding that the pharmacy cashier saw what appeared to be a firearm.

rim.  See PSR ¶ 12, at 6.  He also had a bandage on his leg.  See PSR ¶ 12, at 6.  The officers also observed that he fled the scene in a black Dodge Avenger.  See PSR ¶ 12, at 6.  They also discovered latent fingerprints on the energy drink can.  See PSR ¶ 12, at 6; Police Reports at 2-3.  Police later tested the fingerprints, and preliminarily determined that they matched Padilla's prints.  See PSR ¶ 12, at 6.

### 3. July 27, 2021, Gas Station Robbery.

Four days later, on July 27, 2021, officers were dispatched to a gas station in Albuquerque's northwest quadrant.  See PSR ¶ 13, at 6.  The gas station's cashier reported that a man with black hair, dark skin, and tattoos on his arms robbed the store.  See PSR ¶ 13, at 6.  The cashier described that the man was wearing a gray shirt, black shorts, black hat, and black mask.  See PSR ¶ 13, at 6.  The cashier described that the man arrived at the store in a black two-door Dodge Avenger with tinted windows and no license plate.  See PSR ¶ 13, at 6.  He entered the store and pretended to buy a cookie.  See PSR ¶ 13, at 6.  While at the register, the man told the cashier that he had a gun and to give him all the money in the register.  See PSR ¶ 13, at 6.  The cashier gave him $289.75.  See PSR ¶ 13, at 6.

### 4. Investigation Into the Robberies.

Immediately following the July 27, 2021, robbery, officers from various law enforcement agencies "saturated" the area surrounding the gas station.  See PSR ¶ 14, at 6.  Shortly thereafter, officers located a black Dodge Avenger in the area and followed it to a residence in Albuquerque's southwest quadrant.  See PSR ¶ 14, at 6; Police Reports at 5-6.  A man matching the description of the man who robbed the store, the pharmacy, and gas station left the Dodge and entered the residence.  See PSR ¶ 14, at 6.  The man was wearing a black shirt and black shorts.  See PSR ¶ 14, at 6.  The man then left the residence with his daughter.  See PSR ¶ 14, at 6.  Investigators

continued to surveil the man and his daughter as they traveled to various locations and then returned to the residence. See PSR ¶ 14, at 6; Police Reports at 5-6. The officers conducted a background investigation and identified the suspect as Padilla. See PSR ¶ 14, at 6.

Once Padilla returned to the residence, the officers arrested him. See PSR ¶ 14, at 6; Police Reports at 5-6. The officers interviewed Padilla's wife and daughter. See PSR ¶ 14, at 6. Padilla's wife said that she knew that Padilla was being sought in connection with a series of robberies. See PSR ¶ 14, at 6. She said that she had confronted Padilla about the allegations and that he had admitted to robbing two businesses. See PSR ¶ 14, at 6. She explained to the officers that Padilla has a blood disorder that prevents a wound on his leg from healing and that he is addicted to oxycodone. See PSR ¶ 14, at 6.

Officers obtained a search warrant for Padilla's home and black Dodge Avenger. See PSR ¶ 15, at 6. In the house, they located a gray Albuquerque Dukes hat and two cellphones. See PSR ¶ 15, at 7. They also found "several articles of clothing" that Padilla had worn during the robberies. Police Reports at 10. They did not, however, locate any guns or money in the course of searching the house and car. See PSR ¶ 15, at 7.

Officers also interviewed Padilla. See PSR ¶ 16, at 7. During the interview, Padilla admitted to committing the store, pharmacy, and gas station robberies, plus the nine other robberies in the Complaint and "additional robberies that are still under investigation." Complaint ¶ 19, at 8. See PSR ¶ 16, at 7. He said that he had robbed the businesses because he needed money to pay bills. See PSR ¶ 16, at 7. He denied using a firearm during the robberies and instead reported that he used a "part of a frame," Complaint ¶ 19, at 8, or a stick that "he portrayed as a gun." PSR ¶ 16, at 7.

**PROCEDURAL BACKGROUND**

On August 5, 2021, the United States charged Padilla with twelve counts of violating 18 U.S.C. § 1951 for interfering with commerce by threats or violence.  See Complaint ¶ 3, at 2. The Complaint alleges that Padilla robbed the store, pharmacy, and gas station, and that he committed nine other robberies in Albuquerque between July 11, 2021, and July 27, 2021.  See Complaint ¶¶ 4-17, at 2-7.  The Grand Jury later indicted Padilla on six counts of violating 18 U.S.C. § 1951 for robbing the store, pharmacy, gas station, and three other establishments in Albuquerque.  See Indictment at 1-3, filed September 14, 2021 (Doc. 17).  In each count, the Indictment specifies that Padilla "threatened the [victim] with an object appearing to be a firearm." Indictment at 1-3.

Padilla pled guilty to three counts of violating 18 U.S.C. § 1951: Count 1 for the store robbery, Count 4 for the pharmacy robbery, and Count 6 for the gas station robbery.  See Plea Agreement ¶ 7, at 3-5.  In the Plea Agreement, Padilla admits that he robbed the store with "what appeared to be a black handgun."  Plea Agreement ¶ 7, at 4.  He also admits that he robbed the pharmacy with "what appeared to be a grey handgun."  Plea Agreement ¶ 7, at 4.  Finally, he admits that he told the gas station cashier that he had a gun.  See Plea Agreement ¶ 7, at 4.

The United States Probation Office ("USPO") filed the PSR on November 4, 2022.  See PSR at 1.  The PSR recites the offense conduct.  See PSR ¶¶ 9-17, at 6-7.  Among other things, the PSR asserts that Padilla robbed the store with "a black handgun."  PSR ¶ 11, at 5.  The PSR also asserts that Padilla robbed the pharmacy with "a grey firearm."  PSR ¶ 12, at 5-6.

The PSR then calculates the offense level for each count separately and then groups the counts pursuant to U.S.S.G. § 3D1.4.  See PSR ¶¶ 22-48, at 7-9.  The PSR indicates that the base offense level for all three counts is 20.  See PSR ¶¶ 23, 29, 35, at 8.  The PSR applies a 5-level

increase to the base offense level for each count, pursuant to U.S.S.G. § 2B3.1(b)(2)(C) for brandishing a firearm. See PSR ¶¶ 24, 30, 26, at 8. The PSR assigns 1.0 unit to each count pursuant to U.S.S.G. § 3D1.4(a), (b), and (c). See PSR ¶ 41, at 9. Because the greatest offense level is 25, and the charges amount to 3.0 units, the PSR establishes that the combined adjusted offense level is 28. See PSR ¶¶ 42-44, at 9. Finally, the PSR applies a 2-level decrease pursuant to U.S.S.G. § 3E1.1(a) for acceptance of responsibility, and a 1-level decrease pursuant to U.S.S.G. § 3E1.1(b) for assisting authorities in the investigation or prosecution of the offense. See PSR ¶¶ 46, 47, at 9. In sum, the PSR determines that the total offense level is 25. See PSR ¶ 48, at 9.

On December 14, 2022, Padilla filed the Defendant's Sentencing Memorandum (Doc. 50)("Padilla Sentencing Memo."), and the Padilla Objection. See Padilla Objection at 1. In the Padilla Sentencing Memo. and the Padilla Objection, Padilla: (i) objects to the PSR's factual allegations;[3] and (ii) protests U.S.S.G. § 2B3.1(b)(2)(C)'s applicability. As to the PSR's factual allegations, Padilla "maintains that he did not utilize a real firearm during the commission of the robberies." Padilla Sentencing Memo. at 2. As to U.S.S.G. § 2B3.1(b)(2)(C), Padilla contends that the 5-level increase is not applicable, "because it cannot be shown that an actual firearm, as defined by the guidelines, was brandished or possessed while committing the robberies." Padilla Objection at 2. Padilla explains that the Guidelines "distinguish between firearms and dangerous weapons." Padilla Objections at 2. A "firearm" is "any weapon . . . which will or is designed to

---

[3]The Padilla Sentencing Memo. and Padilla Objection do not assert expressly that Padilla objects to the PSR's factual allegations. Nevertheless, the Padilla Sentencing Memo. asserts that Padilla "maintains that he did not utilize a real firearm during the commission of the robberies." Padilla Sentencing Memo. at 2. That assertion is at odds with the PSR's suggestion that Padilla committed the store robbery with a black handgun, see PSR ¶ 11, at 5, and the pharmacy robbery with a gray firearm, see PSR ¶ 12, at 5-6. Accordingly, the Court construes the Padilla Sentencing Memo. as raising an objection to the PSR's factual allegations. The Court resolves the dispute in its findings of fact above. See Fed. R. Crim. P. 32(i)(3)(B).

or may readily be converted to expel a projectile by action of an explosive." Padilla Objection at 2 (quoting U.S.S.G. § 1B1.1 Application Note 1(H)). By contrast, a dangerous weapon is "an instrument capable of inflicting death or serious bodily injury, or an object that is not an instrument capable of inflicting death or serious bodily injury but closely resembles such a weapon." Padilla Objection at 2 (quoting U.S.S.G. § 1B1.1 Application Note 1(E)). Padilla asserts that "an object resembling a real firearm cannot be treated as a firearm under the Guidelines." Padilla Objection at 3 (citing United States v. Koonce, 991 F.2d 693 (11th Cir. 1993); United Sates v. Burnett, 16 F.3d 358 (9th Cir. 1994)). Padilla avers that because "there is no evidence that the object used by Mr. Padilla was a real firearm as defined by the Guidelines," the Court should apply a 3-level enhancement under U.S.S.G. § 2B3.1(b)(2)(E) for brandishing a dangerous weapon, and not a 5-level enhancement under U.S.S.G. § 2B3.1(b)(2)(C) for brandishing a firearm. Padilla Objection at 3-4.

The United States responded to the Padilla Objection on December 19, 2022. See United States' Response to Defendant's Objections to the Presentence Report and Sentencing Memorandum, filed December 19, 2022 (Doc. 52)("U.S. Sentencing Memo."). The United States emphasizes that it "is under no burden to produce the actual weapon used" for U.S.S.G. § 2B3.1(b)(2)(C) to apply. U.S. Sentencing Memo. at 3. The United States points to caselaw concerning the United States' burden to prove that an object is a firearm at trial, which establishes that "witness identification of the weapon as a firearm is sufficient." U.S. Sentencing Memo. at 3 (quoting United States v. Sandoval, 125 F.3d 864 (Table), 1997 WL 606882, at *2 (10th Cir. October 2, 1997)("Sandoval")). According to the United States, "if such statements are sufficient to meet the burden of beyond a reasonable doubt, those statements are also sufficient to meet the lesser standard of preponderance of the evidence" at sentencing. U.S. Sentencing Memo. at 3.

Accordingly, the United States contends that the cashiers' statements indicating that they thought Padilla had a firearm are sufficient to support an application of U.S.S.G. § 2B3.1(b)(2)(C). See U.S. Sentencing Memo. at 3-4.

On January 9, 2023, the USPO filed the Addendum to the Presentence Report (Doc. 54)("PSR Addendum"). The PSR Addendum reiterates the factual allegations in the Plea Agreement and PSR. See PSR Addendum at 2. It asserts:

> According to victim statements in Counts 1 and 4, the defendant brandished a firearm by displaying part of the weapon in order to intimidate the victims. As such, a five-level enhancement pursuant to USSG § 2B3.1(b)(2)(C) is applicable as to Counts 1 and 4. With respect to Count 6, the victim reported the defendant made it known that he had a firearm in an attempt to intimidate the victim; however, he did not expose it. Thus, upon further analysis, a two-level enhancement pursuant to USSG § 2B3.1(b)(2)(F) is applicable as to Count 6.

PSR Addendum at 2. The PSR Addendum adds:

> The new adjusted offense level for Count 6 in paragraph 40 of the PSR is 22. This change does not affect the units attributed to Count 6, and therefore, pursuant to USSG § 3D1.4, the increase in offense level remains the same. Subsequently, the total offense level also remains the same, resulting in a guideline imprisonment range of 57 to 71 months.

PSR Addendum at 2.

The Court's Courtroom Deputy contacted the parties on January 17, 2023, to inquire whether they object to the PSR Addendum, specifically its suggestion that a 2-level enhancement applies to Count 6 under U.S.S.G. § 2B3.1(b)(2)(F). See PSR Addendum at 2. The United States indicates that it has no objection to the 2-level enhancement. Padilla's counsel also indicates that Padilla has no objection to the 2-level enhancement. Accordingly, the Court only will address the objections pertaining to Counts 1 and 4.[4] On January 17, 2023, the USPO filed the 2nd Addendum

---

[4]Accordingly, the Court will not apply the 5-level increase to Padilla's base offense level for Count 6, because a preponderance of the evidence does not support a finding that Padilla brandished a firearm during that robbery. As the PSR Addendum notes correctly, Padilla "did not

to the Presentence Report (Doc. 56)("Second PSR Addendum").  The Second PSR Addendum summarizes the Padilla Objection, notes that the USPO responded, and provides further victim impact information.  See Second PSR Addendum at 1-2.

## ANALYSIS

The Court sustains Padilla's objection and concludes that the 5-level increase under U.S.S.G. § 2B3.1(b)(2)(C) is not applicable to Counts 1 and 4, because a preponderance of the evidence does not support a finding that Padilla brandished a firearm within the Guidelines' meaning.  U.S.S.G. § 2B3.1(b)(2) provides:

> (2) . . . . (C) if a firearm was brandished or possessed, increase by 5 levels; (D) if a dangerous weapon was otherwise used, increase by 4 levels; (E) if a dangerous weapon was brandished or possessed, increase by 3 levels; or (F) if a threat of death was made, increase by 2 levels.

U.S.S.G. § 2B3.1(b)(2).

> "Brandished" with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person,

---

expose" a weapon in the course of the gas station robbery like he did during the store robbery or pharmacy robbery.  PSR Addendum at 2.  Instead, he told the gas station cashier that he had a gun without ever showing a gun or any object that looked like a gun.  See PSR ¶ 13, at 6.  U.S.S.G. § 1B1.1 Application Note 1(C) instructs that, "although the dangerous weapon does not have to be directly visible" for an increase to apply for brandishing, "the weapon must be present."  U.S.S.G. § 1B1.1 Application Note 1(C).  Here, the Court cannot conclude that it is more likely than not that a "weapon . . . [was] present" when Padilla robbed the gas station.  Although Padilla told the gas station cashier that he had a gun, there is insufficient evidence to suggest that Padilla had a firearm when he robbed the gas station.  The gas station cashier did not report seeing a gun, a holster, a bulge in Padilla's clothing, or anything else that might indicate that a weapon was present, and law enforcement never located a gun in Padilla's car or home.  See PSR ¶ 15, at 7.  While this conclusion requires the Court to conclude that Padilla was lying to the gas station cashier, people who commit robberies often are not credible witnesses.  Padilla was either lying when he said he had a gun or he is lying now when he denies having had a gun during the robberies.  The meager record suggests to the Court that he was lying to the gas station cashier.  For that reason, the Court determines that a preponderance of the evidence does not support a finding that a weapon was present, and, therefore, concludes that there is insufficient evidence to apply a 5-level increase to Count 6.

regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.

U.S.S.G. § 1B1.1 Application Note 1(C).

"Firearm" means (i) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (ii) the frame or receiver of any such weapon; (iii) any firearm muffler or silencer; or (iv) any destructive device. A weapon, commonly known as a "BB" or pellet gun, that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm.

U.S.S.G. § 1B1.1 Application Note 1(H).

"Dangerous weapon" means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

U.S.S.G. §1B1.1 Application Note 1(E).

Applied here, those principles indicate that a preponderance of the evidence does not support a finding that Padilla brandished a firearm during the store robbery or the pharmacy robbery, because there is not sufficient evidence on the record to find that the objects the cashiers saw in Padilla's waistband are "firearms" within the Guidelines' meaning. At bottom, there are two pieces of evidence that indicate that Padilla may have had a firearm while robbing the store and the pharmacy: (i) the store cashier and pharmacy cashier both said that Padilla brandished what appeared to be a black gun and a gray gun, respectively, see PSR ¶¶ 11, 12, at 5, 6, and (ii) the pharmacy cashier said that Padilla said "I don't wanna shoot you" while robbing the pharmacy, PSR ¶ 12, at 6. The Court does not give considerable weight to either piece of evidence.

First, the cashiers' statements that they saw that Padilla had what appeared to be a gun during both robberies do not convince the Court that Padilla had a gun during the robberies. This

is New Mexico, and there are many people here who have experience handling and caring for guns. An experienced gun handler may be able to identify a gun from across a counter when it is tucked in someone's clothing. If an experienced gun handler had identified the gun, that fact would weigh more heavily in the Court's decision-making. See United States v. Sedillo, 557 F. App'x 769, 771 (10th Cir. 2014)(giving weight to an armed robbery victim's firearm identification where the witness had experience around guns, completed basic military training, and once owned the same type of gun as the gun used in the robbery); Sandoval, 1997 WL 606882, at *1 (giving weight to victims' firearm identifications where two of the victims had experience with guns). There is no evidence on the record, however, that suggests the cashiers at issue here have any experience handling guns or otherwise are qualified to distinguish a real firearm from a fake firearm. It is possible that the guns are BB guns, toy guns, or replicas, and there is no evidence on the record that shows that the cashiers were able to tell the difference among those. If the guns were BB guns, toy guns, or replicas, they would not provide a sufficient basis for U.S.S.G. § 2B3.1(b)(2)(C)'s application. See United States v. Koonce, 991 F.2d at 696-98 (concluding that a BB gun is a dangerous weapon, but not a firearm, for U.S.S.G. § 2B3.1(b)(2)'s purposes); United States v. Robinson, 20 F.3d 270 (7th Cir. 1994)(affirming district court's determination that a toy gun is a dangerous weapon, but not a firearm, for U.S.S.G. § 2B3.1(b)(2)'s purposes; United States v. Mahler, 891 F.2d 75, 76-77 (4th Cir. 1989)(concluding that a replica gun could not support U.S.S.G. § 2B3.1(b)(2)(C)'s application).

Second, Padilla's statement during the pharmacy robbery that "I don't wanna shoot you" does not persuade the Court that Padilla had a gun during the robbery.[5] Defendants often lie in the

---

[5] Padilla's statement during the gas station robbery "I have a gun" does not persuade the Court that Padilla had a firearm during the gas station robbery for the same reasons that Padilla's

course of robberies and suggest that they are armed when, in reality, they are not. See United States v. Souther, 221 F.3d 626 (4th Cir. 2000)(concerning a defendant who robbed a bank and slipped a bank teller a note saying "I have a gun, be quiet!" when he was unarmed); United States v. Tate, 999 F.3d 374 (6th Cir. 2021)(involving a defendant who robbed a bank and led a bank teller to believe he was armed when he was not). There are many reasons a defendant might make such a lie during a robbery, including the desire to intimidate the victim and ensure a quick and effective heist. The Court concludes on the record before it that Padilla lied when he implied that he had a gun during the pharmacy robbery, and the gas station robbery, which was on a different day at a different establishment.

     By contrast, that officers were unable to locate a gun -- or two firearms -- weighs heavily in the Court's analysis. Padilla robbed the gas station on July 27, 2021, telling the cashier that he had a gun. See Police Reports at 5. Shortly after the robbery, law enforcement began surveilling Padilla as he drove home and then ran errands with his daughter. Police Reports at 5-6. When Padilla arrived home from running errands, law enforcement arrested him, and searched his home and car later that same day. See PSR ¶ 15, at 6. Despite the fact that officers found clothing which matched witness' description of Padilla's clothing during the robberies, they could not find the alleged firearms after searching for them extensively. See PSR ¶ 15, at 6. If Padilla was armed when he robbed the gas station, it seems unlikely that he would have been able to stash or dispose of his gun while being tailed by law enforcement without law enforcement noticing or being able to find the gun during the search. That the guns were never recovered -- coupled with a dearth of

---

statement "I don't wanna shoot you" while robbing the pharmacy does not convince the Court that Padilla had a gun while robbing the pharmacy.

other evidence -- leads the Court to conclude by a preponderance of the evidence that Padilla was not armed with a firearm during the robberies.

That Padilla confessed to the robberies, but denied having used a gun, also weighs heavily in the Court's analysis.  After he was arrested, Padilla confessed to all twelve robberies charged in the Complaint, plus "additional robberies that are still under investigation."  Complaint ¶ 19, at 8.  See PSR ¶ 16, at 7.  At the time, he denied using a firearm during the robberies.  Complaint ¶ 19, at 8.  Padilla "maintains that he did not utilize a real firearm during the commission of the robberies."  Padilla Sentencing Memo. at 2.  If Padilla had used a firearm during the twelve or more robberies, the Court cannot discern why he would have confessed to the robberies, but lied and denied using a gun in the course of those robberies.  Instead, it seems more likely that Padilla was truthful in all aspects of his confession: he robbed the businesses, but did not use a gun while doing so.

In sum, a preponderance of the evidence supports a finding that Padilla did not brandish a firearm during either robbery.  Without more information, the Court finds that Padilla's threats that he had a gun were hollow and that the alleged guns were fake.  The evidence cannot support a finding that it is more likely than not that the alleged guns that Padilla brandished are firearms as defined by U.S.S.G. § 1B1.1.  At most, the Court can determine by a preponderance of the evidence that the weapons looked like guns, but not that they are firearms.  For these reasons, the Court will not apply the 5-level increase for brandishing a firearm to Count 1 or Count 4 for the store robbery and pharmacy robbery, respectively.

The United States invokes Sandoval in an effort to convince the Court that witness identification of a gun is sufficient to support a finding that a weapon is a firearm, but the United States' reliance on Sandoval is not persuasive.  See U.S. Sentencing Memo. at 3.  The United

States invokes Sandoval for the proposition that "witness identification of [a] weapon as a firearm is sufficient" to show that a weapon is a firearm beyond a reasonable doubt. U.S. Sentencing Memo. at 3 (quoting Sandoval, 1997 WL 606882, at *2). The United States takes Sandoval out of context. In Sandoval, Sandoval and his co-defendant robbed two banks. See 1997 WL 606882, at *1. During the robberies, Sandoval displayed guns and held several people at gunpoint. See 1997 WL 606882, at *1. He was charged with two counts of armed bank robbery, two counts of use of a firearm during a bank robbery, and one count of being a felon in possession of a firearm. See 1997 WL 606882, at *1. At trial, four witnesses plus Sandoval's co-defendant testified that Sandoval's guns appeared to be real, while one witness testified the guns appeared to be fake. See 1997 WL 606882, at *2. The jury convicted Sandoval on all counts. See 1997 WL 606882, at *1. The Tenth Circuit reviewed the jury's verdict and concluded that a "reasonable jury could have concluded that the guns used by Sandoval were real." 1997 WL 606882, at *2. The Tenth Circuit reasoned that all four witnesses who testified that the guns looked real got "very good looks" at the guns, and noted that "one witness had the gun pointed right in her face while another observed the gun resting on a counter close enough she could have picked it up." 1997 WL 606882, at *2. Two of the witnesses who testified that the guns looked real had "significant experience with the care and handling of guns." 1997 WL 606882, at *2. Meanwhile, the one witness who testified the guns looked fake "was positioned farther away from the locus of the action" than the other four witnesses and had no prior experience with guns. See 1997 WL 606882, at *2. Accordingly, the Tenth Circuit concluded that the jury had sufficient evidence to find that Sandoval's guns were real beyond a reasonable doubt. See 1997 WL 606882, at *2.

Conversely, the evidence here is not robust enough to find by a preponderance of the evidence that Padilla's guns are real. Unlike in Sandoval, only one witness saw each alleged gun.

See 1997 WL 606882, at *2.  Unlike in Sandoval, the Court does not know how good of a look the cashiers got at the weapons.  See 1997 WL 606882, at *2.  Also unlike in Sandoval, the Court does not know whether the cashiers have any experience with firearms.  See 1997 WL 606882, at *2.  Although the record in Sandoval was robust enough for the Tenth Circuit to find that the witness' identifications alone were sufficient to prove that Sandoval's guns were firearms beyond a reasonable doubt, the thinner record here is not sufficient to prove by a preponderance of the evidence that Padilla's weapons were firearms.

The Court will apply 3-level increases to Count 1 and Count 4, however, for brandishing a dangerous weapon.  See U.S.S.G. § 2B3.1(b)(2)(E).  First, a preponderance of the evidence supports a finding that Padilla brandished a weapon while robbing the store when he lifted his shirt to show the cashier an object that looked like a gun in an effort to intimidate the cashier to give him the money in the cash register.  See U.S.S.G. § 1B1.1 Application Note 1(C); PSR ¶ 11, at 5.  Similarly, a preponderance of the evidence supports a finding that Padilla brandished a weapon while robbing the pharmacy when he grabbed at the handle of an object that appeared to be a gun in an effort to intimidate the cashier to give him the money in the cash register.  See U.S.S.G. § 1B1.1 Application Note 1(C); PSR ¶ 12, at 6.  Further, a preponderance of the evidence supports a finding that the alleged guns that Padilla used "closely resemble[d]" firearms, because both cashiers saw them and believed they were firearms.  U.S.S.G. §1B1.1 Application Note 1(E); PSR ¶¶ 11, 12, at 5, 6.  For these reasons, a preponderance of the evidence supports a finding that Padilla brandished dangerous weapons during the store robbery and pharmacy robbery, and, therefore, the 3-level increase under U.S.S.G. § 2B3.1(b)(2)(E) applies to Counts 1 and 4.

This case is within the heartland of cases in which courts in the Tenth Circuit have applied the U.S.S.G. § 2B3.1(b)(2)(E) enhancement in the past.  For example, in United States v. Abbott,

the Tenth circuit upheld a district court's application of U.S.S.G. § 2B3.1(b)(2)(E) where the defendant entered a bank, slipped the teller a threatening note, kept his hand at his waistband, but was not actually armed.  See 69 F. App'x 936, 938 (10th Cir. 2003).  Similarly, in United States v. Farrow, the Tenth Circuit upheld a district court's application of U.S.S.G. § 2B3.1(b)(2)(E) where the defendant kept his hand in his pocket, and told a bank teller not to make a scene or he would do something reckless, but was not actually armed.  See 277 F.3d 1260, 1262 (10th Cir. 2002).  Like in those cases, Padilla led the cashiers to believe that he was armed by acting like he was armed, and threatening that he was armed.  Therefore, U.S.S.G. § 2B3.1(b)(2)(E)'s application is appropriate.

**IT IS ORDERED** that: (i) the objection that Defendant Marty Padilla raises in the Defendant's Objections to Presentence Investigation Report, filed December 14, 2022 (Doc. 51), is sustained; (ii) 3-level increases apply to the base offense levels for Counts 1 and 4 under § 2B3.1(b)(2)(E) of the United States Sentencing Guidelines for brandishing a dangerous weapon; (iii) a 2-level increase applies to the base offense level for Count 6 under U.S.S.G. § 2B3.1(b)(2)(F) for making a threat of death; (iv) the applicable offense level is 23 and the applicable criminal history category is I; and (v) the Guidelines establish an imprisonment range of 46 to 57 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Alexander M. M. Uballez
  United States Attorney
Timothy Dale Trembley
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Margaret Katze
  Federal Public Defender
Esperanza S. Lujan
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

    *Attorneys for the Defendant*